STATE OF NORTH CAROLINA v. MATTHEW LAWRENCE TAYLOR

No. COA05-1580

(Filed 18 July 2006)

**1. Discovery— criminal—statutory only—interviewing prosecution witnesses—not included in statute**

A detective was not required to submit to an interview with defense counsel against his wishes before trial. Pretrial discovery is statutory rather than a constitutional or common law right, and the General Assembly has not included the right to interview the State's witnesses in a criminal trial in the discovery statute. N.C.G.S. § 15A-903(a)(1).

**2. Evidence— hearsay exception—plan for future act—murder victim's statement**

A murder victim's statement of his plans for the night on which he was killed was admissible pursuant to the hearsay exception in N.C.G.S. § 8C-1, Rule 803(3), as a then-existing plan to engage in a future act.

**3. Search and Seizure— probable cause to search residence—binding findings**

The trial court correctly determined that probable cause existed to search a murder defendant's residence where there were unchallenged findings that it was reasonable to conclude that a crime had been committed, that defendant was involved, and that his residence might contain items missing from the victim's car and the weapon used in the crime.

**4. Evidence— testimony that cellular phone images existed—no details—no prejudice**

There was no prejudice in a prosecution for first-degree murder and other crimes in admitting testimony that defendant had a cellular telephone with stored photos. No evidence was presented about the contents of the images (guns), the jury did not see the images, and presuming the telephone was improperly seized, defendant failed to show that a different result would likely have been reached if that evidence had been excluded.

**5. Appeal and Error— preservation of issues—evidence previously admitted without objection**

The benefit of an objection is lost if the evidence has previously been admitted without objection. Defendant here failed to preserve his objection for appellate review where he did not object when the prior written statements were offered or admitted, but did object when the State sought to publish the statements to the jury. The court properly gave a limiting instruction.

**6. Discovery— school records of witness—reviewed in camera—not discoverable**

The school records of a tenth grader (an accomplice to first-degree kidnapping and murder) who testified in defendant's trial pursuant to a plea agreement were reviewed in camera on appeal and held to contain no information favorable and material to defendant's guilt and punishment, nor any evidence adversely affecting the witness's credibility. Therefore, the trial court properly denied defendant's motion to be allowed to review those records for impeachment purposes.

**7. Evidence— autopsy photographs—illustrations of victim's wounds**

There was no abuse of discretion in admitting autopsy photographs of a murder victim where a forensic pathologist testified that each photograph depicted a distinct aspect of the victim's wounds and would provide the jury with a helpful illustration of the wounds.

**8. Evidence— pathologist's opinion—time required for death**

An expert forensic pathologist's testimony about the time a victim's death from his wounds would have required had he not drowned was within the witness's area of expertise and was relevant and appropriate to show the number and severity of the wounds. The trial court did not abuse its discretion by admitting it.

**9. Witnesses— last-minute—not abuse of discretion**

The trial court did not abuse its discretion in a first-degree murder prosecution by admitting testimony from a "surprise witness," a telephone company manager who retrieved text messages between the victim's telephone number and one assigned to defendant.

**10. Evidence— transcript of text messages—authentication— confrontation issue not preserved**

The trial court did not abuse its discretion by admitting into evidence transcripts of text messages. There was testimony sufficient to authenticate the exhibits; moreover, defendant both failed to cite on appeal any authority to support the argument that his right to confront witnesses was denied and did not object at trial on constitutional grounds.

**11. Constitutional Law— cruel and unusual punishment—life sentence for sixteen-year-old**

The argument that a life sentence without parole for a sixteen-year-old defendant was cruel and unusual was not raised at trial and was not preserved. Even so, defendant did not show that his sentence violated his constitutional rights.

**12. Appeal and Error— presentation of issues—assignments of error—insufficient**

Assignments of error were deemed abandoned where defendant merely recited the standards of review and stated that he chose not to elaborate other than to state the argument and cite authorities for the court's review.

Appeal by defendant from judgments entered 20 July 2005 by Judge Henry W. Hight in Durham County Superior Court. Heard in the Court of Appeals 8 June 2006.

*Attorney General Roy Cooper, by Assistant Attorney General Amy C. Kunstling, for the State.*

*James M. Bell, for defendant-appellant.*

TYSON, Judge.

Matthew Lawrence Taylor ("defendant") appeals from judgments entered after a jury found him to be guilty of first-degree murder, first-degree kidnapping, and robbery with a dangerous weapon of Sean Owens ("the victim"). We find no prejudicial error.

### I. Background

The victim, age twenty-three, lived with his mother, stepfather, and sister in Franklinton. The victim's sister, Tiffany McFalls ("McFalls") testified the victim was an openly homosexual male. On 17 February 2004, the victim walked into the kitchen, where McFalls

**STATE v. TAYLOR**

[178 N.C. App. 395 (2006)]

was washing dishes, and told her he was going to Durham to meet someone nicknamed "Blue" and that "he was going to go get some black meat tonight." McFalls testified she interpreted this statement to mean the victim was "going to Durham to have sex with a black person." The victim told McFalls he had communicated with "Blue" through his cellular telephone, which contained internet access, was going to "check on some things at work," and would be back home "in a little bit." The victim left home driving his mother's 1998 burgundy Ford Contour automobile.

McFalls became concerned after she was unable to contact the victim and he did not return home by 5:00 p.m. The victim's family reported him as a missing person on 20 February 2004.

On 21 February 2004, Durham police and paramedics responded to a report of a dead body floating in the river at Old Farm Park in Durham. The body was found face down approximately twenty feet below the river embankment. The body was identified as the victim.

On 22 February 2004, Durham police were dispatched to 614 Shepard Street where they found a 1998 burgundy Ford Contour belonging to the victim's mother partially burned and still smoldering. Investigators recovered a broken beaded necklace belonging to the victim from the floorboard of the car. Investigators determined the fire had been intentionally set with a lit newspaper.

On 4 March 2004, Durham police executed a search warrant of defendant's residence. Shelton Epps ("Epps") and Derrick Maiden ("Maiden") were present at defendant's residence. Defendant was at school when police executed the warrant. Defendant agreed to go to the police station, where he gave a statement to Detective Wallace Early ("Detective Early").

### A. Defendant's Statement

Defendant told Detective Early that he came home early from school on 17 February 2004 because he had an upset stomach. Epps and Maiden were present at defendant's residence. Maiden asked defendant if he could use his cellular telephone. Maiden told defendant that someone was coming over. About thirty minutes later, the victim called defendant on his cellular telephone. Defendant told the victim that he did not know him, and handed the telephone to Maiden. Maiden told defendant, "let's go to the clubhouse." Defendant accompanied Epps and Maiden to the Eno Trace Clubhouse. The victim had parked the burgundy Ford Contour automobile in the parking lot when defendant, Epps, and Maiden arrived.

The victim drove defendant, Epps, and Maiden to Old Farm Park. All four men exited the car and began walking toward a picnic table. Defendant stated he was walking in front and the other three men were behind him. Defendant heard a gunshot, turned around, and saw Epps chasing the victim across the park with a gun in his hand. Epps wrestled the victim to the ground, and Maiden and Epps began to punch and kick the victim. Epps put the gun to the back of the victim's head and shot him again. Either Epps or Maiden choked the victim. Epps and Maiden dragged the victim to the river and threw him in. Maiden drove the victim's car away from the scene with defendant and Epps as passengers, and dropped defendant off at his residence. The next day at school, Maiden told defendant a "boot" had been placed on the car. Maiden gave money to Jimetrus Harris ("Jimetrus") to pay the fine to have the boot removed. Maiden drove defendant home after school in the victim's mother's burgundy Ford Contour. After defendant gave his statement, Detective Early spoke with two other detectives and placed defendant under arrest.

Defendant was indicted for first-degree murder, first-degree kidnapping, and robbery with a dangerous weapon. Defendant was tried in the Durham County Superior Court in July 2005. Defendant was seventeen years of age at the time of trial.

## B. The Murder Weapon

Derek Taylor ("Taylor") testified for the State that he had known defendant for a couple of months before February 2004. Taylor knew defendant by the name "Blue." During that time, Taylor saw defendant in possession of a handgun on four or five occasions. Taylor later bought that gun from a man named "Wood" for $132.00. After the victim's murder, Taylor had a conversation with "Wood" and turned the gun over to police. State Bureau of Investigation Forensic Firearms Examiner Adam Tanner ("Examiner Tanner") testified he identified the gun as a .32 caliber Smith & Wesson revolver. Examiner Tanner opined the bullets recovered from the victim's body were fired from "this firearm and this firearm alone."

The jury found defendant to be guilty of all three charges. Defendant was convicted of first-degree murder under the Felony Murder Rule rather than on the basis of malice, premeditation, and deliberation.

The trial court arrested judgment on defendant's robbery conviction. Defendant was sentenced to life imprisonment without parole

for the first-degree murder conviction and a consecutive sentence of seventy-three to ninety-seven months for the kidnapping conviction. Defendant appeals.

## II. Issues

Defendant argues the trial court erred by: (1) denying his motion to allow an interview with the police investigator; (2) overruling his objection to McFalls's hearsay testimony regarding what the victim said to her on 17 February 2004; (3) denying his motion to suppress evidence gathered in the search of his residence where probable cause did not support the issuance of the search warrant; (4) overruling his objection to testimony regarding the existence of a cellular telephone and photographic images contained therein where such cellular telephone was taken from him without issuance of a search warrant; (5) overruling his objection to allowing written statements to be published to the jury which were inconsistent with Jimetrus's and his sister, Andrea Harris's, ("Andrea") testimonies in court; (6) denying him the opportunity to review and use school records to impeach Maiden; (7) overruling his objection to the admission of certain autopsy photographs; (8) overruling his objection to speculative testimony by Dr. Gulledge regarding how long it would have taken the victim to die as a result of his injuries; (9) overruling his objection to testimony by surprise witness Michael Woods ("Woods"); (10) overruling his objection to admission of State's Exhibits 87 and 88, transcripts of cellular telephone text messages; (11) denying his motion to dismiss at the close of all evidence; (12) denying his motion to vacate the jury's verdict due to insufficient evidence; and (13) imposing a sentence of life in prison without parole in violation of his Eighth and Fourteenth Amendment Rights.

## III. Interview with the Police Investigator

**[1]** Defendant argues the trial court erred in denying his motion to allow an interview with the police investigator. We disagree.

Defense counsel requested a meeting with Detective Early, the lead police investigator. Detective Early refused to meet with defense counsel. Defense counsel moved the trial court to allow an interview with Detective Early and the trial court denied defendant's motion. The trial court entered findings of fact and conclusions of law in support of its order denying the motion.

The trial court's findings of fact state that Detective Early did not want to and was told by his supervisors that he was not required to

meet with defense counsel. Detective Early knew that it was the "unofficial policy" of the Durham Police Department for an officer to refrain from talking with defense counsel. The trial court found that Detective Early was never advised he was prohibited from meeting with defense counsel by anyone with the Durham County District Attorney's Office.

Defendant did not assign error to any of the trial court's findings of fact. "Where no exception is taken to a finding of fact by the trial court, the finding is presumed to be supported by competent evidence and is binding on appeal." *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991) (citations omitted). The trial court concluded, "no attorney with the Durham County District Attorney's Office has obstructed the Defendant's attempts to conduct an interview with W.L. Early," and that "W.L. Early's refusal to meet with Defendant's attorneys was not the product of any improper directive by anyone with the Durham County District Attorney's Office."

Defendant bases his argument on N.C. Gen. Stat. § 15A-903(a)(1) (2005), which provides in pertinent part:

(a) Upon motion of the defendant, the court must order the State to:

(1) Make available to the defendant the complete files of all law enforcement and prosecutorial agencies involved in the investigation of the crimes committed or the prosecution of the defendant. The term "file" includes the defendant's statements, the codefendants' statements, witness statements, investigating officers' notes, results of tests and examinations, or any other matter or evidence obtained during the investigation of the offenses alleged to have been committed by the defendant.

Defendant claims "the spirit if not the letter" of this statute entitles his counsel to interview Detective Early "for purposes of clarifying discovery material provided by the State."

Our Supreme Court held, "[t]here is no general constitutional or common law right to discovery in criminal cases." *State v. Haselden*, 357 N.C. 1, 12, 577 S.E.2d 594, 602, *cert. denied*, 540 U.S. 988, 157 L. Ed. 2d 382 (2003) (citing *Weatherford v. Bursey*, 429 U.S. 545, 559, 51 L. Ed. 2d 30, 42 (1977); *State v. Alston*, 307 N.C. 321, 335, 298 S.E.2d 631, 641 (1983)). "The right to pre-trial discovery is a statutory right." *State v. Phillips*, 328 N.C. 1, 12, 399 S.E.2d 293, 298, *cert. denied*, 501 U.S. 1208, 115 L. Ed. 2d 977 (1991). Prior to the 2004

amendment of N.C. Gen. Stat. § 15A-903, our Supreme Court held, "Nothing in the statutory provisions compels State witnesses to subject themselves to questioning by the defense before trial." *Id.* Nothing in the 2004 amendments to N.C. Gen. Stat. § 15A-903 appears to have changed this rule. The General Assembly could have provided but failed to include defendant's right to interview State's witnesses in the statute. Under our Supreme Court's precedent in *Phillips*, Detective Early was not required to submit to an interview by the defense counsel against his wishes prior to trial. *Id.* This assignment of error is overruled.

## IV.  Hearsay Testimony

[2] Defendant argues the trial court erred by overruling his objection to hearsay testimony from McFalls regarding what the victim stated to her on 17 February 2004. We disagree.

McFalls testified as follows:

Q:  Tiffany, that morning or that afternoon when you were talking with Sean, what did he tell you? What did he tell you that morning, February 17th, 2004?

. . . .

A:  He came into the kitchen while I was washing dishes. He had his cell phone in his hand. Then he said he was going to go get some black meat tonight. Well, he told me his name, which was Taylor's name. I couldn't remember it at the time.

. . . .

Q:  Tiffany, when he said he was going to get some black mean [sic] tonight, what did he say to you after that?

A:  He was going to meet Blue.

Rule 803 of the North Carolina Rules of Evidence sets forth exceptions to the hearsay rule. The Rule provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(3) Then Existing Mental, Emotional, or Physical Condition.—A statement of the declarant's then existing state of mind, emotion,

sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health) . . . .

N.C. Gen. Stat. § 8C-1, Rule 803(3) (2005). The victim's statements to McFalls is admissible under this exception to the hearsay rule. The victim's statement tended to show his plan or intent to engage in a future act. *See State v. McElrath,* 322 N.C. 1, 17, 366 S.E.2d 442, 451 (1988) (telephone message written by a neighbor from the victim to his roommate that the victim was traveling to North Carolina with the defendant was admissible under Rule 803(3) because it was a statement of the victim's "then-existing intent to do an act in the future"); *State v. Braxton,* 352 N.C. 158, 190-91, 531 S.E.2d 428, 447 (2000) ("Moore's statement to McCombs that he was going to approach the defendant about straightening out the victim's debt was admissible as evidence of Moore's then-existing intent to engage in a future act."), *cert. denied,* 531 U.S. 1130, 148 L. Ed. 2d 797 (2001); *State v. Taylor,* 332 N.C. 372, 385-86, 420 S.E.2d 414, 422 (1992) (witness's testimony that the victim had requested the day off from work and said "that the Taylor guy was coming to pay him the money" was admissible to show then-existing intent and plan to engage in a future act).

As in *McElrath, Braxton,* and *Taylor* precedents, McFalls's testimony showed the victim's then-existing plan to engage in a future act. The trial court properly admitted the testimony pursuant to N.C. Gen. Stat. § 8C-1, Rule 803(3). This assignment of error is overruled.

### V. Motion to Suppress

**[3]** Defendant asserts the trial court erred in denying his motion to suppress the items seized from his residence and argues the search warrant was not supported by probable cause. We disagree.

Our Supreme court stated in *State v. Sinapi:*

[W]hen addressing whether a search warrant is supported by probable cause, a reviewing court must consider the totality of the circumstances. In applying the totality of the circumstances test, this Court has stated that an affidavit is sufficient if it establishes reasonable cause to believe that the proposed search . . . probably will reveal the presence upon the described premises of the items sought and that those items will aid in the apprehension or conviction of the offender. Probable cause does not mean actual and positive cause nor import absolute certainty. Thus, under the totality of the circumstances test, a reviewing court

must determine whether the evidence as a whole provides a substantial basis for concluding that probable cause exists.

In adhering to this standard of review, we are cognizant that great deference should be paid a magistrate's determination of probable cause and that after-the-fact scrutiny should not take the form of a *de novo* review.

359 N.C. 394, 398, 610 S.E.2d 362, 365 (2005) (internal quotations omitted). Finding of Fact Number 15 in the trial court's order summarizes the information set forth in the affidavit in support of the search warrant. In Finding of Fact Number 16, the trial court found "it is reasonable to conclude that a crime has been committed, that the defendant was involved in that crime and that his residence might contain certain items missing from Sean Owens car and the weapon used to commit the crime." Defendant did not assign error to these findings of fact and they are binding on appeal. *Koufman,* 330 N.C. at 97, 408 S.E.2d at 731.

After a careful review of the trial court's order, the trial court correctly determined probable cause existed for the search, and did not err in denying defendant's motion to suppress. This assignment of error is overruled.

## VI.  Evidence of Defendant's Cellular Telephone

[4] Defendant argues the trial court erred in admitting testimony regarding the existence of his cellular telephone and photographic images contained therein, because the cellular telephone was taken from him without issuance of a search warrant.

The police took a cellular telephone capable of taking photographs from defendant at the police station on 4 March 2004. This telephone was not the same cellular telephone the text messages were sent to and received from the victim. Sergeant David Rose testified on *voir dire* that stored images of two guns were recovered from the cellular telephone. Defendant moved to suppress this evidence on the grounds the cellular telephone had been impermissibly seized from him. The trial court ordered the State not to present the contents of the photographic images stored within the cellular telephone to the jury unless the State could show the cellular telephone was properly seized from defendant.

No evidence was presented to the jury regarding the contents of the photographic images stored on the cellular telephone. The

only evidence presented to the jury was that defendant possessed a cellular telephone with photographic images stored within upon his arrest. The jury did not see the photographic images or hear evidence regarding their contents. Presuming *arguendo* the cellular telephone was improperly seized, defendant has failed to demonstrate any prejudice. Defendant has failed to show that "a different outcome likely would have been reached" if the evidence would have been excluded. *State v. Mann*, 355 N.C. 294, 306, 560 S.E.2d 776, 784, *cert. denied*, 537 U.S. 1005, 154 L. Ed. 2d 403 (2002). This assignment of error is overruled.

### VII.  Witnesses' Prior Statements

**[5]** Defendant argues the trial court erred in admitting the prior written statements of Jimetrus and Andrea Harris to police for corroborative purposes.

Jimetrus and Andrea were fellow students with defendant at Northern High School. Jimetrus and defendant were teammates on the high school football team. Jimetrus drove defendant home from school occasionally. On 18 February 2004, defendant told Jimetrus a "boot" had been placed on his car in the school parking lot. Jimetrus did not know what car defendant was talking about. Jimetrus told defendant that he would have to go to the school office and pay $25.00 to have the boot removed. Defendant and Jimetrus went to the school office together. Defendant gave Jimetrus $25.00 and asked him to pay to have the boot removed because he did not have his driver's license with him. Jimetrus paid the fine and the boot was removed. Defendant then asked Jimetrus to retrieve the car for. him. The car was parked behind the school cafeteria in a lot restricted to students. Jimetrus drove the vehicle, a 1998 burgundy Ford Contour, to the front of the school where he met defendant. On a prior occasion, defendant had told Jimetrus that he owned a gun. Andrea testified that she knew defendant by the nickname "Blue."

Defendant failed to object when the prior written statements were offered or admitted into evidence. Defendant did object when the State sought to publish the statements to the jury. The trial court noted that defendant's objection was "a little late" because defendant failed to object upon their admission into evidence. The trial court overruled defendant's objection to the statements being published to the jury. The trial court instructed the jury that the statements were admitted solely to corroborate the witnesses' in-court testimonies.

"In order to preserve a question for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C.R. App. P. 10(b)(1) (2006). Our Supreme Court has held, "Where evidence is admitted over objection, and the same evidence has been previously admitted or is later admitted without objection, the benefit of the objection is lost." *State v. Whitley*, 311 N.C. 656, 661, 319 S.E.2d 584, 588 (1984). The trial court properly gave a limiting instruction to the jury. Defendant failed to preserve this issue for our review. This assignment of error is dismissed.

## VIII.  Derrick Maiden

Defendant argues the trial court erred in denying his motion to review and use Maiden's school records to impeach his testimony. We disagree.

Maiden was also charged with first-degree murder, robbery with a dangerous weapon, and first-degree kidnapping in connection with the victim's death. The State offered Maiden a plea bargain for second degree murder. Maiden testified for the State at defendant's trial under a plea agreement in exchange for truthful testimony.

### A.  Maiden's Testimony

In February 2004, Maiden was a tenth grade student at Northern High School. Maiden had been friends with defendant, whom he called "Blue," since Maiden was ten years old. Maiden was also friends with Epps, who resided in defendant's home.

On 17 February 2004, Maiden and defendant left school early due to snow and went to defendant's house. Epps was present at defendant's house and played video games with Maiden. Defendant went outside the house speaking on his cellular telephone. Defendant reentered his home and told Maiden and Epps "the whip was on the way." Maiden testified that "whip" meant car. Maiden, Epps, and defendant left defendant's house to meet the victim at the clubhouse. Defendant went back inside the house, returned with a gun, and handed it to Epps. Defendant and Epps discussed who would carry the gun. Maiden testified Epps carried the gun, but defendant stated "he would shoot him if the guy resisted."

The three men entered the victim's car upon arrival at the clubhouse. Defendant sat in the front passenger's seat. The victim drove

to a Donut King and then to the store to buy a cigar to use to roll marijuana. Defendant possessed marijuana in a plastic bag. The victim drove defendant, Maiden, and Epps back to the park at approximately 1:00 p.m.

According to Maiden, the four men exited the victim's car and began walking towards a park bench. Epps shot the victim in the back of the head. The victim began running and stated, "please don't do this to me." Defendant and Epps chased after the victim and wrestled him to the ground. The victim got up and ran towards his car. As the victim attempted to enter his car, defendant hit him again. Epps tried to shoot the victim a second time. Epps handed Maiden the gun, and Maiden handed the gun to defendant. Defendant handed the gun back to Epps. Maiden testified that "somewhere along the line" the victim was shot a second time. After the victim fell to the ground, Epps began choking the victim, saying "he won't die." Epps stomped the victim in the head. After these incidents, Maiden testified he "thought [the victim] was dead."

Defendant and Maiden carried the victim to the river bank. Epps kicked the victim into the river. The three men reentered the victim's mother's car. Epps pulled the car over to wash the victim's blood off of him with snow. Defendant, Maiden, and Epps drove around for an hour or two smoking marijuana before returning to defendant's house. Defendant drove the car.

Defendant drove Maiden to school the following day in the victim's car. Defendant did not want to pay for a parking pass and parked the car behind the cafeteria. Epps gave Maiden a pair of boots from the victim's car. Maiden was wearing the victim's boots when he was arrested on 4 March 2004.

On 19 February 2004, Epps sprayed lighter fluid into the car and set in on fire. Defendant, Maiden, and Epps had wiped the car down with Clorox the night before. Maiden testified the plan on 17 February 2004 was to steal the victim's car. He also testified that defendant had tried unsuccessfully about a month or two earlier to contact someone on a chat line and steal that person's car.

### B. Maiden's School Records

[6] Defendant asked to be provided with Maiden's juvenile and school records to determine if any impeachment material was contained in those records. Maiden had no prior juvenile record. The trial court received and reviewed Maiden's school records *in camera*. The

trial court concluded "there is nothing in them which is discoverable in this matter." The trial court ordered Maiden's school records to be resealed and placed in the record for appellate review.

Defendant has requested this Court to examine Maiden's sealed records and determine whether they contain information "favorable" and "material" to defendant's guilt and punishment. *State v. McGill*, 141 N.C. App. 98, 102, 539 S.E.2d 351, 355 (2000). "If the sealed records contain evidence which is both 'favorable' and 'material,' defendant is constitutionally entitled to disclosure of this evidence." *Id.* (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 60, 94 L. Ed. 2d 40, 59 (1987)). " 'Favorable' evidence includes evidence which tends to exculpate the accused, as well as 'any evidence adversely affecting the credibility of the government's witnesses.' " *Id.* (quoting *U.S. v. Trevino*, 89 F.3d 187, 189 (4th Cir. 1996)). " 'Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.' " *Id.* at 103, 539 S.E.2d at 356 (quoting *United States v. Bagley*, 473 U.S. 667, 682, 87 L. Ed. 2d 481, 494, (1985)).

After reviewing Maiden's sealed school records, we hold they do not contain information favorable and material to defendant's guilt and punishment, nor any evidence adversely affecting Maiden's credibility as a witness. *Id.* This assignment of error is dismissed.

### IX. Autopsy Photographs

**[7]** Defendant argues the trial court erred by admitting certain autopsy photographs into evidence. We disagree.

This Court recently discussed the admission of autopsy photographs:

Pictures of a victim's body may be introduced "even if they are gory, gruesome, horrible or revolting, so long as they are used for illustrative purposes and so long as their excessive or repetitious use is not aimed solely at arousing the passions of the jury." *State v. Hennis*, 323 N.C. 279, 284, 372 S.E.2d 523, 526 (1988). While noting that there is no bright line test to determine what is an excessive amount of photographs, *Hennis* instructs that courts should examine the "content and the manner" in which the evidence is used and the "totality of circumstances" comprising the presentation. *Id.* at 285, 372 S.E.2d at 527. The decision as to

whether evidence, including photographic evidence, is more probative than prejudicial under Rule 403 of the Rules of Evidence and what constitutes an excessive number of photographs lies within the sound discretion of the trial court. *State v. Sledge*, 297 N.C. 227, 232, 254 S.E.2d 579, 583 (1979).

*State v. Anderson*, 175 N.C. App. 444, 451, 624 S.E.2d 393, 399 (2006).

Here, Dr. Christopher Gulledge ("Dr. Gulledge") testified during *voir dire* that each of the photographs depict distinct aspects of the victim's wounds, and each photograph would be helpful to illustrate the victim's wounds to the jury. Defendant has failed to show the trial court abused its discretion in admitting the autopsy photographs. This assignment of error is overruled.

### X. Dr. Gulledge's Testimony

[8] Defendant argues the trial court erred in overruling his objection as "speculative" to testimony by Dr. Gulledge regarding how long it took the victim to die. We disagree.

Dr. Gulledge performed an autopsy on the victim's body. Dr. Gulledge found a number of blunt force injuries to the victim's face and two gunshot wounds on the right side of the victim's head. One of the gunshot wounds was a point blank or contact wound. Dr. Gulledge opined neither of the two gunshot wounds to the victim's head would not have been immediately lethal, and that the cause of the victim's death was drowning.

The following exchange took place during the State's direct examination of Dr. Gulledge:

Q: Now, Dr. Gulledge, you told the jury that the injuries that you observed were bruises on the face, is that right, and scrapes and scratches?

A: That is correct.

Q: And from looking at those bruises and scrapes and scratches on his face, were those injuries in and of themselves, enough to cause Sean to die?

A: I do not believe so.

Q: And then I believe the next thing you talked to the jury about was a gunshot to the ear, is that right?

A: That's correct.

Q: And that injury of itself, was that enough to cause Sean to die?

A: It would not be immediately lethal. It may have been lethal over time without medical attention, but would not—it would not have been an immediately lethal injury.

Q: And do you have an estimate as to how long it would have— by itself, that wound would have taken him to die if he hadn't gotten medical attention.

DEFENSE COUNSEL: Objection to the speculation.

THE COURT: Overruled.

A: On the order of hours.

Q: And what about the second gunshot wound?

A: The gunshot wound to the back of the head caused the depressed skull fracture would not—also would not have been immediately lethal. A depressed skull fracture is a serious medical emergency and would require surgical attention, but it would not be immediately lethal.

We review the trial court's admission of expert testimony under an abuse of discretion standard. *State v. Washington*, 141 N.C. App. 354, 362, 540 S.E.2d 388, 395 (2000), *disc. rev. denied*, 353 N.C. 396, 547 S.E.2d 427 (2001).

Dr. Gulledge was allowed to testify without objection as a medical expert witness in the field of forensic pathology. An expert witness may testify in the form of opinion if "scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." N.C. Gen. Stat. § 8C-1, Rule 702 (2005)

In *State v. Bearthes*, the medical examiner testified that the victim received twenty-three life-threatening wounds and died from these wounds within a three-to-five-minute period. 329 N.C. 149, 162, 405 S.E.2d 170, 177 (1991). The medical examiner then testified regarding how long it would have taken the victim to die from each individual wound. *Id.* Our Supreme Court explained, "In determining whether a defendant acted after premeditation and deliberation, the nature of wounds to a victim is a circumstance to be considered." *Id.* (citing *State v. Bray*, 321 N.C. 663, 365 S.E.2d 571 (1998). At bar, defendant was tried for first-degree murder on the basis of malice, premeditation, and deliberation and under the Felony Murder Rule.

Here, as in *Bearthes,* Dr. Gulledge's opinions "were within his area of expertise and . . . were relevant and appropriate to show the number and severity of the wounds." *Id.* at 162-63, 405 S.E.2d at 177. This assignment of error is overruled.

## XI. State's "Surprise" Witness

**[9]** Defendant argues the trial court erred in allowing testimony from the State's "surprise" witness, Woods. Woods's name was not included on the State's witness list provided to defendant. The State called Woods as a witness and was allowed to testify over defendant's objection.

Maiden had previously testified defendant's cellular telephone number was 919-423-2117. The victim worked at Wireless Express with Woods and had been issued a company-owned cellular telephone with the number 919-279-7004. The victim's telephone could send and receive text messages and could access the internet.

Woods was the manager of Wireless Express and had retrieved text messages received by and sent from the telephone number assigned to the victim's telephone on 16 and 17 February 2004. These text messages were admitted as State's Exhibits 87 and 88. These exhibits include sexually explicit text messages setting up a rendezvous that were sent to and received from telephone number 919-423-2117. Woods testified regarding the text messages sent to and received from the victim's company issued cellular telephone number and the telephone number 919-423-2117, which Maiden had testified belonged to defendant. We review the trial courts admission of "surprise" witness testimony for an abuse of discretion. *Kinlaw v. N.C. Farm Bureau Mutual Ins. Co.,* 98 N.C. App. 13, 19, 389 S.E.2d 840, 844 (1990).

N.C. Gen. Stat. § 15A-903(a)(3) (2005) provides that at the beginning of jury selection, the State is required to give a defendant "a written list of the names of all other witnesses whom the State reasonably expects to call during the trial." The statute further provides:

If there are witnesses that the State did not reasonably expect to call at the time of the provision of the witness list, and as a result are not listed, the court upon a good faith showing shall allow the witnesses to be called. Additionally, in the interest of justice, the court may in its discretion permit any undisclosed witness to testify.

*Id.* Defendant objected to allowing the State to present the subject of the text messages sent and received between the victim's cellular telephone and the cellular telephone with the number 919-423-2117. Defendant argued earlier the State had failed to present evidence to show the identity of the person who had retrieved the text messages. The State contacted Woods, who had retrieved the text messages. The State notified the court and defendant of its intention to call Woods as a witness. Woods was present to testify in court "with less than an hour's notice." Defendant objected on the grounds that Woods was not included on the State's witness list. The State pointed out that the "Custodian of Nextel Phone Records" was included on the State's witness list. Woods's name was also listed within Detective Early's file, which had been provided to defendant during discovery. Transcripts of the text messages were also provided to defendant during discovery.

The trial court allowed Woods to testify for the State. The court said it would give the defense as much time as needed to meet with Woods and prepare a cross-examination. The defense requested to meet with Woods at the end of the day and be prepared to cross-examine him the following day. The trial court agreed to this request.

Although Woods was not listed by name as a witness the State reasonably expected to call, the State did disclose it would call the "Custodian of Nextel Phone Records," and provided Woods's name to defendant as listed in Detective Early's file. Defendant was also provided with the transcript of the text messages during discovery. Defendant has failed to show the trial court abused its discretion in admitting Woods's testimony pursuant to N.C. Gen. Stat. § 15A-903(a)(3). This assignment of error is overruled.

## XII.  Admission of Text Messages

**[10]** Defendant argues the trial court erred in denying his motion *in limine* and admitting State's Exhibits 87 and 88 into evidence. These exhibits are printouts or transcripts of the text messages sent to and from the telephone number assigned to the victim's company issued cellular telephone. We disagree.

Defendant argues the text messages were not properly authenticated. The trial court made written findings of fact stating the reasons the court was satisfied that State's Exhibits 87 and 88 are what they purport to be, copies of the incoming and outgoing text messages for cellular telephone number 919-279-7004. Defendant did not object to

the trial court's findings of fact and they are binding on appeal. *Koufman*, 330 N.C. at 97, 408 S.E.2d at 731. We review the trial court's denial of defendant's motion *in limine* for an abuse of discretion. *State v. Williams*, 355 N.C. 501, 547, 565 S.E.2d 609, 636 (2002), *cert. denied*, 537 U.S. 1125, 154 L. Ed. 2d 808 (2003).

Rule 901 of the North Carolina Rules of Evidence provides, "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." N.C. Gen. Stat. § 8C-1, Rule 901(a) (2005). The statute provides several methods to authenticate evidence. N.C. Gen. Stat. § 8C-1, Rule 901(b). This list includes testimony of a witness with knowledge "that a matter is what it is claimed to be." N.C. Gen. Stat. § 8C-1, Rule 901(b)(1).

Brent Jones ("Jones"), a strategic care specialist with Nextel Communications ("Nextel"), testified at trial. Jones testified Nextel keeps a record of all incoming and outgoing text messages to and from its customers. The content of text messages and the times they are received and sent are stored in the Nextel database. Customers of Nextel may access a record of their text messages via the internet by visiting Nextel's website and inserting their access code. Jones testified that he does not have access to the text messages stored in Nextel's database.

Woods testified at trial as a manager of the Wireless Express Store in Raleigh in February 2004. Woods assigned and issued the victim a Nextel cellular telephone with the number 919-279-7004. The victim's cellular telephone contained the capacity to send and receive text messages. Woods was authorized to access the Nextel website for text messages to and from cellular telephone number 919-279-7004. Woods identified State's Exhibit 87 to be what he had retrieved from the Nextel website as the stored incoming text messages for cellular telephone number 919-279-7004. Woods also identified State's Exhibit 88 to be what he had retrieved from the Nextel website as the stored outgoing text messages for cellular telephone number 919-279-7004.

Jones and Woods are both witnesses with knowledge of how Nextel sent and received text messages and how these particular text messages were stored and retrieved. This testimony was sufficient to authenticate States Exhibits 87 and 88 as text messages sent to and from the victim's assigned Nextel cellular telephone number on 16 and 17 February 2004.

Defendant argues no showing was made of who actually typed and sent the text messages. The text messages contain sufficient circumstantial evidence that tends to show the victim was the person who sent and received them. *See* N.G. Gen. Stat. § 8C-1, Rule 901(b)(4) (provides authentication may be made through "Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances."). The messages include information that the person would be driving a 1998 Contour, and the sender self-identified himself twice as "Sean," the victim's first name.

Although this issue has not been considered in this jurisdiction, other jurisdictions have upheld admission of electronic messages as properly authenticated. *See U.S. v. Whitaker*, 127 F.3d 595, 601 (7th Cir. 1997) (rejecting the defendant's argument that the government failed to authenticate computer records where the government presented testimony of an FBI agent who was present when records were retrieved); *U.S. v. Safavian*, 435 F. Supp. 2d 36, 40 (D.C. Cir. 2006) (e-mail messages held properly authenticated where the e-mail addresses contain "distinctive characteristics" such as, *inter alia*, the "@" symbol and a name of the person connected to the address, the bodies of the messages contain a name of the sender or recipient, and the contents of the e-mails also authenticate them as being from the purported sender and to the purported recipient); *Massimo v. State*, 144 S.W.3d 210, 216-17 (Tex. App. 2004) (e-mail message held properly authenticated where, *inter alia*, the e-mail was sent to the victim's e-mail address shortly after she and defendant had a physical altercation and the e-mail referenced that altercation, and the victim recognized defendant's e-mail account address.).

Defendant argues he was denied his Sixth Amendment right to confront witnesses against him. Defendant failed to object on this ground at trial. Constitutional issues not raised and passed upon at trial will not be considered for the first time on appeal. *State v. Benson*, 323 N.C. 318, 322, 372 S.E.2d 517, 519 (1988) (citation omitted). Further, defendant failed to cite any authority in support of this argument, and it is deemed abandoned. N.C. R. App. P. 28(b)(6) (2006) ("Assignments of error not set out in the appellant's brief, or in support of which no reason or argument is stated or authority cited, will be taken as abandoned.").

The State properly authenticated the text messages pursuant to N.C. Gen. Stat. 8C-1, Rule 901. The trial court did not abuse its dis-

cretion in denying defendant's motion *in limine* and admitting State's Exhibits 87 and 88. This assignment of error is overruled. Defendant's attempt to argue lack of ability to confront witnesses is abandoned and dismissed.

## XIII.  Life Imprisonment Without Parole

[11] Defendant argues the trial court erred in sentencing him to life in prison without parole in violation of the Eight Amendment's prohibition against cruel and unusual punishment because he: (1) was not proven to be the shooter; (2) was sixteen years old at the time the victim was shot; and, (3) had no prior record.

Defendant also failed to preserve this argument for appellate review. He did not raise the issue or object to the sentencing before the trial court. Constitutional issues not raised and passed upon at trial will not be considered for the first time on appeal. *State v. Benson*, 323 N.C. 318, 322, 372 S.E.2d 517, 519 (1988) (citation omitted).

Presuming *arguendo* defendant had properly raised and preserved this assignment of error, defendant has failed to show his sentence of life in prison without parole violated his constitutional rights. "Only in exceedingly unusual non-capital cases will the sentences imposed be so grossly disproportionate as to violate the Eighth Amendment's proscription of cruel and unusual punishment." *State v. Ysaguire*, 309 N.C. 780, 786, 309 S.E.2d 436, 441 (1983). Defendant was convicted of first-degree murder on a felony murder theory. In *State v. Hightower*, 168 N.C. App. 661, 669-70, 609 S.E.2d 235, 240-41, *disc. rev. denied*, 359 N.C. 639, 614 S.E.2d 533 (2005), this Court rejected the defendant's argument that the trial court's imposition of a life in prison without parole sentence for felony murder was cruel and unusual.

Defendant asserts the lack of evidence presented to show he was the shooter renders his sentence cruel and unusual. Evidence presented tended to show that defendant arranged for the meeting with the victim, helped beat the victim, and helped carry the victim to the riverbank where Epps kicked him into the river. Dr. Gulledge testified the cause of the victim's death was drowning.

In *State v. Mann*, our Supreme Court stated:

[I]f two persons join in a purpose to commit a crime, each of them, if actually or constructively present, is not only guilty as a principal if the other commits that particular crime, but he is

also guilty of any other crime committed by the other in pursuance of the common purpose . . . or as a natural or probable consequence thereof.

355 N.C. at 306, 560 S.E.2d at 784 (citations and quotations omitted), *cert. denied*, 537 U.S. 1005, 154 L. Ed. 2d 403 (2002).

Defendant also asserts the sentence imposed is cruel and unusual in light of his age at the time of the victim's death. In *State v. Lee*, this Court held a sentence of life in prison without parole imposed on a defendant who was fourteen years old at the time he committed murder was not cruel and unusual. 148 N.C. App. 518, 524-25, 558 S.E.2d 883, 888, *appeal dismissed*, 355 N.C. 498, 564 S.E.2d 228, *cert. denied*, 537 U.S. 955, 154 L. Ed. 2d 305 (2002). Defendant has failed to show his life in prison without parole sentence rises to the level of cruel and unusual punishment. *Id.*

[12] In defendant's eleventh and twelfth assignments of error, he argues the trial court erred in denying his motion to dismiss at the close of all evidence and denying his motion to vacate the jury's verdict based on insufficient evidence. In these assignments of error, defendant merely recites the standards of review and states, "the Appellant chooses not to elaborate . . . other than to state the above argument and cite the above authorities for this honorable court's review." Because defendant has set forth "no reason or argument" in support of these assignments of error, they are deemed abandoned. N.C. R. App. P. 28(b)(6).

## XIV. Conclusion

The trial court did not err in denying defendant's motion to require the police investigator to submit to a pretrial interview with defense counsel. Detective Early was not required to submit to an interview against his wishes by defense counsel prior to trial. *Phillips*, 328 N.C. at 12, 399 S.E.2d at 298; N.C. Gen. Stat. § 15A-903(a)(1). The trial court properly admitted hearsay testimony from McFalls regarding what her brother, the victim, stated to her on 17 February 2004 pursuant to N.C. Gen. Stat. 8C-1, Rule 803(3). The trial court properly concluded the search warrant of defendant's residence was supported by probable cause, and properly denied defendant's motion to suppress the items seized from his residence.

Defendant has failed to show he was prejudiced by the admission of testimony regarding the existence of his cellular telephone containing images of two guns where the contents of those images were

not revealed to the jury. Defendant failed to properly preserve his argument regarding the admission into evidence of Jimetrus and Andrea Harris' prior statements. Defendant failed to object when the statements were admitted.

After review of Maiden's sealed school records, we hold they neither contain information favorable and material to defendant's guilt and punishment, nor evidence adversely affecting Maiden's credibility as a witness.

The trial court did not abuse its discretion in: (1) admitting the autopsy photographs of the victim; (2) allowing Dr. Gulledge's testimony regarding how long it would have taken the victim to die as a result of his injuries; (3) admitting printouts of the text messages sent to and received from the victim's cellular telephone; and (4) allowing Woods to testify as a "surprise" witness.

Defendant's eleventh and twelfth assignments of error regarding his motion to dismiss and motion to vacate the jury's verdict are deemed abandoned. Although defendant failed to object or properly preserve the trial court's imposition of a life in prison without parole sentence, his arguments reveal no errors in his sentence. Defendant received a fair trial free from prejudicial errors he preserved, assigned, and argued.

No prejudicial error.

Judge McCULLOUGH and HUDSON concur.